Filed 12/3/13  P. v. Williams CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B245317 |
| Plaintiff and Respondent, | (Super. Ct. No. 1312078) |
| v. | (Santa Barbara County) |
| WALDEN REID WILLIAMS, | |
| Defendant and Appellant. | |

Walden Reid Williams appeals a judgment following conviction of grand theft (two counts), sale of subdivision land without a public report (two counts), and misdemeanor false or misleading advertising of subdivision land, with findings that the crimes involved excessive takings and are related felonies involving related felony conduct.  (Pen. Code, §§ 484, 487, subd. (a);[1] Bus. & Prof. Code, §§ 11018.2, 11022, subd. (a), 11023; §§ 12022.6, subd. (a)(2),[2] 1203.045, subd. (a), 186.11, subd. (a)(1).) We vacate the restitution order and remand for a hearing regarding restitution, but otherwise affirm.

*FACTUAL AND PROCEDURAL HISTORY*

Williams owned undeveloped real property in northern Santa Barbara County, known as "Dominion Ranch Road, LLC" ("DRR"), which was subdivided into

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

[2] References to section 12022.6 are to the version in effect prior to January 1, 2012.

20-acre parcels.  In July 1998, with the approval of the County of Santa Barbara ("County"), he installed an agricultural well on the property.  The County then informed Williams in writing that a permit was required to draw the well water for residential or domestic use.

In 1999, Williams employed Cal-Coast Irrigation ("Cal-Coast") to install an irrigation system "to distribute water to the farming blocks" on the property.  The company installed an irrigation system on DRR for agricultural use only, including "chemigation" valves, a booster pump, and particular fittings that did not allow for potable water.  Cal-Coast was not licensed to, and did not design or install domestic water systems.

In 2001, Williams contacted Norman Fujimoto, a County employee overseeing domestic water systems and water well construction.  Fujimoto sent Williams a domestic water permit application and an information sheet regarding domestic water systems.  Fujimoto advised Williams that the County required information regarding the chemical quality of the well water and the nature of the existing water pipes.  The County also required adequate water storage and a pump test of the well to ensure that it produced sufficient water.  Fujimoto informed Williams that California law required Williams to create a mutual water company and register it with the California Secretary of State.  Williams later telephoned Fujimoto to discuss the matter, but he did not submit any domestic water system application.

In the summer of 2001, Williams contacted Richard Dolittle, a civil engineer, regarding conversion of "the [existing] water system from agricultural to domestic."  Dolittle advised Williams in writing of the mechanics involved in converting the agricultural system – rerouting pipes, relocating the booster pump, and adding to lateral piping, among other things.  Dolittle retained a hydrologist to assist him and, by 2002, developed final plans for the conversion.  Necessary repairs to the existing system had been completed and the system had been observed and tested.

The County did not issue Williams a domestic water permit, however, because of environmental concerns regarding the tiger salamander, an endangered

wildlife species. The County informed Williams that it required an environmental impact report regarding the protected salamander. In mid-2003, an environmental impact report was prepared, suggesting mitigating measures to protect the salamander.[3]

In 2002, Williams employed Lawnae Hunter, a real estate broker, to sell DRR parcels. Hunter placed advertisements, stating "some general language about possibly building . . . homes . . . on the lots." She later sold parcels to Brian Abel and Clete Doyal, among others. Real estate agent Brad Berch thereafter assumed Hunter's sales responsibilities regarding DRR parcels.

*DRR Parcel Purchasers*

*Clete Doyal*

In 2004, Clete Doyal and his wife visited DRR because they were interested in purchasing a retirement property. Doyal saw a billboard on DRR property to the effect of "Build your dream home." The Doyals informed Hunter that they intended to build a retirement home and a barn. Hunter informed them that the property contained a domestic water system; Williams informed them that a mutual water company existed. Prior to purchasing the property, Doyal did not know that there was no approved domestic water system or that a mutual water company did not exist.

*Brian Abel*

In 2004, Brian Abel visited DRR property and saw an advertisement placed on the property regarding building a dream home. He contacted Hunter and informed her that he intended to build a family home. She stated that a domestic water system had been approved, and gave him documents regarding a mutual water company. Prior to purchasing a parcel, Abel met with Williams, who also informed him that the County had approved a domestic water system. Abel also advised Williams that he intended to build a residence for his family on the property.

Abel bought a DRR parcel in January 2005. He later contacted the County to discuss installation of a back-flow valve to begin the building permit process. A

_____

[3] In the years that followed, certain DRR property owners complied with mitigating measures and obtained land-use permits to build homes.

3

County employee informed Abel that every parcel owner would be required to install a back-flow valve. Williams later assured Abel that as manager of the mutual water company, he would "force" every parcel owner to install a back-flow valve.

In late 2006, Abel contacted Cal-Coast regarding an irrigation matter. The Cal-Coast owner informed Abel that the existing DRR water system was agricultural only. Shortly thereafter, Abel telephoned Berch and advised him that Cal-Coast had not installed a domestic water system. Berch disputed Abel's assertion and stated that the water system was a domestic water system; Abel thought that Berch did not "really care[] what [Abel] had to say about it."

In March 2007, Williams, Abel, and other property owners had a meeting with County employee Fujimoto regarding obtaining an approved domestic water system. Fujimoto explained the requirements for a domestic water system permit and a mutual water company. He also discussed the mechanics of two options for installing a domestic water system on the property.

Later that year, Abel learned that Williams had not completed the necessary documents to obtain a mutual water company. At a meeting, Abel and other property owners so informed Williams, who responded that he would "bring it up to active status."

By the time of the September 2012 trial, Abel had not built a residence on the DRR parcel he purchased because he could not afford to drill a well on his parcel or to create a domestic water system. Estimates to drill a well were approximately $130,000 or more, and estimates to add on to the existing agricultural water system were "ten times more."

*Judy Paulson & Ronald Dewey*

In 2007, Paulson and Dewey visited DRR property and saw a billboard advertising that the property was suitable for a "dream home," and that it had a shared water well. Paulson contacted Berch who referred her to his website. The website reiterated the billboard advertising. Based upon the advertisements and Williams's written statement during negotiations that "[s]hared water well and distribution lines to property are already in place," Paulson believed that the property had a domestic water

4

system.  Paulson also met Williams who informed her that a mutual water company and a domestic water supply to the property existed.

On February 26, 2007, Paulson and Dewey bought a DRR parcel.  In mid-2007, they applied for a building permit and learned that their parcel had no permitted domestic water system.  Through discussions with Fujimoto in February 2008, Paulson and Dewey learned that Williams had never applied for a domestic water system permit.

In 2008, Paulson and Dewey installed a private water well on their parcel and obtained a building permit to build their residence.  Cost of the well and a code-compliant fire hydrant was $169,175.84.

*2007 Attempts for Domestic Water System*

In October or November 2007, Williams contacted Lori Speer, a civil engineer at Bethel Engineering, to prepare a plan to convert the agricultural water system to a domestic water system.  Speer recommended that portions of the existing irrigation pipe be exposed and examined to verify the pipe type and connections, and a back-up water source be created as required by recent legislation.  On April 1, 2008, Williams submitted an application for a permit, but the application was not approved because Williams did not submit the additional information requested by the County.  In 2009, the County closed out Williams's application as inactive.

*Public Report*

In 2001, Williams applied for a public report from the California Department of Real Estate.  (Bus. & Prof. Code, § 11018.2.)  A report did not issue, however, because Williams did not provide a letter from the DRR water supplier.  In 2009, a special investigator from the Department of Real Estate contacted Williams regarding his failure to obtain a public report.  Williams indicated that he and his attorney decided not to follow through with the application.  Moreover, a title company officer erroneously informed Williams that a public report was not required.  Several buyers testified at trial that they did not receive a public report from Williams.

5

*Conviction and Sentencing*

The jury convicted Williams of grand theft (two counts), sale of subdivision land without a public report (two counts), and misdemeanor false or misleading advertising of subdivision land. (§§ 484, 487, subd. (a); Bus. & Prof. Code, §§ 11018.2, 11022, subd. (a), 11023.) It also found that he took property exceeding $200,000, the theft exceeded $100,000, and the crimes were related felonies involving related felony conduct. (§§ 12022.6, subd. (a)(2), 1203.045, subd. (a), 186.11, subd. (a)(1).) The trial court sentenced Williams to a prison term of six years, including a two-year midterm for grand theft (count 1), subordinate consecutive sentencing for the remaining felony counts, 180 days in county jail for the misdemeanor conviction to be served concurrently to count 1, two years for the related-felony-conduct enhancement of section 186.11, subdivision (a)(1), and a stayed two-year sentence for the excessive taking allegation of section 12022.6, subd. (a). The court also imposed a $6,720 restitution fine and a $6,720 parole revocation restitution fine (stayed), and ordered victim restitution. (§§ 1202.4, subd. (b), 1202.45.)

Williams appeals and contends that: 1) there is insufficient evidence of his intent to defraud (counts 1 and 5); 2) there is insufficient evidence that he falsely or misleadingly advertised subdivision land; 3) the trial court erred in defining "good faith belief" in the special instruction regarding sale of subdivision land without a public report; 4) sufficient evidence establishes that his conviction of grand theft against Abel is precluded by the four-year statute of limitations of section 803, subdivision (c)(1); and 5) the trial court abused its discretion in awarding restitution amounts that included the purchase price of two DRR parcels.

*DISCUSSION*

*I.*

Williams argues that there is insufficient evidence that he intended to defraud Abel, Paulson, and Dewey. (§§ 484, 487, subd. (a).) He asserts that the evidence establishes, at best, negligence, a civil matter, or "sloppiness," but not theft by false pretenses.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)  Our review is the same in a prosecution primarily resting upon circumstantial evidence.  (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.)  We do not redetermine the weight of the evidence or the credibility of witnesses.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)  We must accept logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise.  (*Streeter*, at p. 241.)  "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*Albillar*, at p. 60.)

A theft conviction pursuant to the theory of theft by false pretenses requires proof that the defendant made a false representation to the property owner, the representation was made with the intent to defraud the owner, and the owner transferred the property in reliance on the representation.  (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842.)  Evidence of the defendant's intent is usually inferred from the facts and circumstances surrounding the crime.  (*People v. Lewis* (2001) 25 Cal.4th 610, 643.)

Sufficient evidence supports Williams's conviction of grand theft by false pretenses.  Williams represented to Paulson, Dewey, and Abel that an approved domestic water system was already in place and required only a back-flow device for each parcel. Williams knew that the purchasers intended to build homes on the property.  Paulson, Dewey, and Abel testified that they would not have purchased a DRR parcel had they known the parcels lacked an approved domestic water system.  Although Williams made attempts to convert the agricultural water system to a domestic water system over the years, he did not follow through with the County to correct any possible deficiencies and obtain final approval.  By the time of trial, he still had not installed an approved domestic water system on the property.  Williams also informed purchasers that a mutual water

7

company existed, when in fact it did not. This evidence and all reasonable inferences therefrom establish Williams's intent to defraud.

*II.*

Williams contends that insufficient evidence supports his misdemeanor conviction of false or misleading advertising of subdivision land, pursuant to Business and Professions Code section 11022, subdivision (a). He asserts that the sales sign posted on DRR property truthfully stated that, ultimately, a purchaser could build a home on the property.

Business and Professions Code section 11022, subdivision (a) provides: "It is unlawful for an owner, subdivider, agent or employee of a subdivision or other person, with intent directly or indirectly to sell or lease subdivided lands or lots or parcels therein, to authorize, use, direct, or aid in the publication, distribution, or circularization of an advertisement, radio broadcast, or telecast concerning subdivided lands, that contains a statement, pictorial representation, or sketch that is false or misleading."

Sufficient evidence and all reasonable inferences therefrom support Williams's conviction of misdemeanor false or misleading advertising. (*People v. Streeter*, *supra*, 54 Cal.4th 205, 241 [standard of review].) The advertising posted on DRR property by Williams's real estate agents represented that a buyer could build a "dream home." Berch's website also stated that the property was suitable for residential building and had a shared water well. The advertising was misleading because it suggested the existence of a prerequisite to residential living – a potable water source. Abel, Paulson, and Dewey each testified that they would not have purchased their DRR parcels had they known the property lacked an approved domestic water system. The advertising also misled purchasers because it did not disclose that in order to obtain a building permit and build a home, a purchaser must obtain a private water source and a permitted domestic water system.

*III.*

Williams claims that the trial court erred in defining the phrase "good faith belief" in the special instruction regarding sale of subdivision land without a public

8

report.  (Bus. & Prof. Code, § 11018.2.)  That instruction provides:  "If you find that the defendant had a reasonable and good faith belief in the existence of an exemption to the requirements of Business and Professions Code section 11018.2 prior to the sale or offer of sale of lots or parcels in a subdivision, you must find the defendant not guilty of the crimes charged in counts 2 and 4.  The defendant has the burden of producing evidence that he had a reasonable and good faith belief in the existence of such exemption.  [¶] . . . [¶]  *A good faith* belief means that the defendant did not act with an actual fraudulent intent; and that he did not conspire with another or others or otherwise actively participate in any fraudulent scheme."

Williams argues that this definition impermissibly related "good faith belief" to the grand theft crimes and erroneously used the word "conspire" because the prosecutor did not charge conspiracy.  He asserts that these errors prevented the jury from considering his defense to the public report counts.

For several reasons, we reject Williams's contention.  First, he has forfeited this argument because he did not request the trial court to modify the special instruction.  (*People v. Lee* (2011) 51 Cal.4th 620, 638.)  "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal."  (*Ibid.*)  If Williams believed the instruction required elaboration or clarification, he was obliged to so request in the trial court.  (*Ibid.*)

Second, the instruction correctly states the definition of good faith.  Our Supreme Court has defined "good faith" as "'that state of mind denoting honesty of purpose [and] freedom from intention to defraud."  (*Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1120.)

Third, considering the instructions as a whole, it is not reasonably likely that the jury was misled as Williams suggests.  (*People v. Tate* (2010) 49 Cal.4th 635, 696 [standard of review for instructional error].)  The special instruction does not refer to the grand theft counts, and the instructions regarding grand theft do not refer to "conspiracy" or "fraudulent scheme."  (CALCRIM No. 1804.)  There is no error.

9

*IV.*

Williams asserts that sufficient evidence establishes that the four-year statute of limitations of section 803, subdivision (c)(1) precludes his conviction of grand theft against Abel. He points out that the prosecution commenced on August 14, 2009, but contends that Abel knew facts sufficient to place a reasonable person on notice before August 14, 2005. (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1444-1445 [statute of limitations regarding theft begins to run when a person has knowledge of facts sufficient to make a reasonable person suspicious of fraud].) Williams relies upon evidence that Abel, a mechanical engineer, purchased the DRR parcel on January 13, 2005; the 2002 environmental impact report states that the DRR property had no domestic water system; and other purchasers, before and after Abel, learned of the water problem.

The trial court instructed with CALCRIM No. 3410: "A defendant may not be convicted of Grand Theft of Personal Property as charged in Count 5 unless the prosecution began within four years of the date the crime should have been discovered. The present prosecution began on August 14, 2009. [¶] A crime *should have been discovered* when the victim was aware of facts that would have alerted a reasonably diligent person in the same circumstances to the fact that a crime may have been committed."

By a preponderance of the evidence, the prosecutor established that the prosecution commenced within the four-year limitations period. (*People v. Castillo* (2008) 168 Cal.App.4th 364, 369 [prosecutor bears burden of establishing by a preponderance of the evidence that the prosecution is not precluded by the statute of limitations].) Sufficient evidence supports the implied finding that Abel only first discovered Williams's fraud in 2006 when he consulted Cal-Coast and learned that DRR property did not have an approved, permitted domestic water system. Abel thereafter telephoned Berch, who disputed Cal-Coast's assertions. Fujimoto confirmed Abel's suspicions in 2007 when he met with other property owners and stated that DRR property lacked an approved domestic water system.

10

Although Doyal testified that he purchased a DRR parcel in 2004, he did not testify to the timing of his knowledge of the DRR water system problem. Paulson and Dewey purchased their DRR parcel in 2007, several years after Abel purchased his parcel. Thus, the suspicions and knowledge of other property owners do not assist Williams's argument.

Moreover, the well permit document given to Abel prior to his purchase does not state that the water system was an agricultural system *only*. Abel testified that the document did not state that a domestic water system was not approved. In addition, Williams informed Abel that the parcel had an approved domestic water system that only required a backflow device. This evidence is sufficient to establish that Abel first became suspicious of Williams's representations in 2006, well within the four-year limitations period.

V.

Williams argues that the trial court erred by including the purchase price of the parcels bought by Paulson and Dewey ($600,000) and Abel ($550,000) in the $2,050,794 total restitution order. He does not question the court's award of the purchasers' expenses to obtain a domestic water system.

At the sentencing hearing, Williams requested a hearing regarding restitution and the trial court agreed to set a hearing. As the Attorney General points out, however, the appellate record does not indicate that a hearing was calendared and held.

We review the trial court's order for an abuse of discretion. (*People v. Giordano* (2007) 42 Cal.4th 644, 663.) Here the court awarded restitution to two parcel purchasers for the full amount of their purchase price as well as their expenses in obtaining a domestic water system. The purchasers owned their DRR parcels at the time of trial, and Paulson and Dewey had built a home on their parcel. The award of the full amount of the purchase price to the two parcel owners constitutes a windfall and more than makes them whole.

As the Attorney General suggests, the proper remedy is to remand the matter to the trial court to conduct a restitution hearing as initially requested by Williams.

11

We vacate the order regarding restitution and remand for a restitution hearing as discussed herein, but otherwise affirm.

NOT TO BE PUBLISHED.



GILBERT, P.J.


We concur:



YEGAN, J.



PERREN, J.

12

Patricia Kelly, Judge

Superior Court County of Santa Barbara

_____

Richard C. Gilman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Connie H. Kan, Deputy Attorney General, for Plaintiff and Respondent.